UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

| | | |
|---|---|---|
| DUSTIN B. MINTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:20-cv-74-GMB |
| | ) | |
| ANDREW M. SAUL, Commissioner, | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

On October 31, 2016, Plaintiff Dustin B. Minton filed an application for Supplemental Security Income ("SSI") with an alleged disability onset date of the same day.[1]  Minton's application for benefits was denied at the initial administrative level.  He then requested a hearing before an Administrative Law Judge ("ALJ").  The ALJ held a hearing on December 27, 2018 and denied Minton's claim on January 31, 2019.  Minton requested a review of the ALJ's decision by the Appeals Council, which declined review on November 23, 2019.  As a result, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration (the "Commissioner") as of November 23, 2019.

---

[1] Minton's initially alleged an onset date of October 1, 2015, but he amended it to October 31, 2016. R. 156.  The relevant period for Minton's SSI application begins with the month in which he filed his application and continues through the date of the ALJ's decision. 20 C.F.R. §§ 416.330 & 416.335; *see also Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

Minton's case is now before the court for review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  Under 28 U.S.C. § 636(c)(1) and Rule 73 of the Federal Rules of Civil Procedure, the parties have consented to the full jurisdiction of a United States Magistrate Judge. Doc. 10.  Based on a review of the parties' submissions, the relevant law, and the record as a whole, the court concludes that the decision of the Commissioner is due to be reversed and remanded.

## I.  STANDARD OF REVIEW[2]

The court reviews a Social Security appeal to determine whether the Commissioner's decision "is supported by substantial evidence and based upon proper legal standards." *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997). The court will reverse the Commissioner's decision if it is convinced that the decision was not supported by substantial evidence or that the proper legal standards were not applied. *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991).  The court "may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner," but rather "must defer to the Commissioner's decision if it is supported by substantial evidence." *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1997) (citation and internal quotation marks omitted).

---

[2] In general, the legal standards are the same whether a claimant seeks disability insurance benefits ("DIB") or SSI.  However, separate, parallel statutes and regulations exist for DIB and SSI claims. Therefore, citations in this opinion should be considered to reference the appropriate parallel provision as context dictates.  The same applies to citations for statutes or regulations found in excerpted court decisions.

"Even if the evidence preponderates against the Secretary's factual findings, [the court] must affirm if the decision reached is supported by substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  Moreover, reversal is not warranted even if the court itself would have reached a result contrary to that of the factfinder. *See Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

The substantial evidence standard is met "if a reasonable person would accept the evidence in the record as adequate to support the challenged conclusion." *Holladay v. Bowen*, 848 F.2d 1206, 1208 (11th Cir. 1988) (quoting *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983)).  The requisite evidentiary showing has been described as "more than a scintilla, but less than a preponderance." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).  The court must scrutinize the entire record to determine the reasonableness of the decision reached and cannot "act as [an] automaton[] in reviewing the [Commissioner's] decision." *Hale v. Bowen*, 831 F.2d 1007, 1010 (11th Cir. 1987).  Thus, the court must consider evidence both favorable and unfavorable to the Commissioner's decision. *Swindle v. Sullivan*, 914 F.2d 222, 225 (11th Cir. 1990).

The court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law or fails to provide the court with sufficient reasoning to determine that the Commissioner properly applied the law. *Grant v. Astrue*, 255 F. App'x 374, 375–76 (11th Cir. 2007) (citing *Keeton v. Dep't of Health & Human*

*Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994)).  There is no presumption that the Commissioner's conclusions of law are valid. *Id.*

## II.  STATUTORY AND REGULATORY FRAMEWORK

To qualify for disability benefits, a claimant must show the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) & 416(i).  A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrated by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).  Plaintiff bears the burden of proving that she is disabled, and is responsible for producing evidence sufficient to support her claim. *See Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003).

A determination of disability under the Social Security Act requires a five-step analysis. 20 C.F.R. § 404.1520(a).  The Commissioner must determine in sequence:

> (1) Is the claimant presently unable to engage in substantial gainful activity?
> (2) Are the claimant's impairments severe?
> (3) Do the claimant's impairments satisfy or medically equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4) Is the claimant unable to perform her former occupation?
> (5) Is the claimant unable to perform other work given her residual

functional capacity, age, education, and work experience?

*See Frame v. Comm'r, Soc. Sec. Admin.*, 596 F. App'x 908, 910 (11th Cir. 2015).

"An affirmative answer to any of the above questions leads either to the next question, or, [at] steps three and five, to a finding of disability.  A negative answer to any question, other than at step three, leads to a determination of 'not disabled.'" *McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986) (quoting 20 C.F.R. § 416.920(a)−(f)).  "Once the finding is made that a claimant cannot return to prior work the burden of proof shifts to the Secretary to show other work the claimant can do." *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995) (citing *Gibson v. Heckler*, 762 F.2d 1516 (11th Cir. 1985)).

## III.  RELEVANT FACTUAL BACKGROUND

Minton was 32 years old at the alleged onset of disability and 34 years old at the time of the ALJ's decision. R. 25 & 142.  His primary complaints are anxiety, panic attacks, stomach problems, acid reflux, obsessive compulsive disorder, Asberger's syndrome, and depression. R. 33–36, 40 & 41.  In his disability report, Minton alleged panic attacks, Asperger's syndrome, and anxiety as the physical or mental conditions that limit his ability to work. R. 161.

Minton completed high school without any special education services and graduated from college with a Bachelor of Arts in History and English. R. 37 & 298. It took him ten years to complete college and he had to finish his coursework online

because he was unable to attend in-person classes. R. 47 & 48.  Minton has held a few jobs on a sporadic basis.  His most recent employment was a summer internship at Goodyear in 2007, where he worked on a sorting line. R. 36–37 & 45.  He testified that he had the internship only because his father worked at Goodyear. R. 37.  He had to quit two months early because he was not able to stay on task and was almost fired. R. 36.  He also worked in the college bookstore for a few weeks stocking shelves and at a grocery store in 2004 stocking shelves. R. 46–47.  Minton has not tried to get a job anywhere else because of his anxiety and panic attacks. R. 37.

Minton lives at home with his parents and is an only child. R. 36 & 41.  He testified that he is unable to take care of himself because of progressively worsening anxiety and panic attacks. R. 36, 37, 38 & 41–42.  Since he was a child, Minton has had problems communicating with others and relating to people his own age, and he describes himself as a loner in school who was bullied. R. 39 & 42.  On a typical day, Minton spends much of his time on the couch watching television and occasionally playing games on Facebook. R. 42–43.  He does not play video games for long periods because this can cause him to have a panic attack and anxiety. R. 43 & 45.  He has not attended church in several years. R. 44.  He used to drive a car, but does not now because of his anxiety. R. 44.  Minton does some household chores when he is able. R. 47.  His mother testified that he has a hard time staying on task with chores around the house. R. 49.  She also testified that he has a regular

daily routine and he becomes upset and nervous with any changes to his routine. R. 52.

Minton submitted a number of medical records to the ALJ to support his claim of disability, including a mental health source statement from psychiatrist Dr. Mary Rutherford, dated September 27, 2018. R. 313.   The statement consists of the following questions, in response to which Dr. Rutherford circled either "yes" or "no":

1. Can Mr. Minton understand, remember or carry out very short and simple instructions?
2. Can Mr. Minton maintain attention, concentration and/or pace for periods of at least two hours?
3. Can Mr. Minton perform activities within a schedule and be punctual within customary tolerances?
4. Can Mr. Minton maintain an ordinary routine without special supervision?
5. Can Mr. Minton adjust to routine and infrequent work changes?
6. Can Mr. Minton interact with supervisors and/or coworkers?
7. Can Mr. Minton maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness?

R. 313.  Dr. Rutherford responded "no" to questions one, two, three, and five, and "yes" to the other questions. R. 313.  She also noted "not always" on questions one and two. R. 313.  Dr. Rutherford stated that, in addition to normal workday breaks, Mr. Minton would be expected to be off-task 60% of the time in an 8-hour day. R. 313.  The notation "N/A" is written in the section asking how many days he would be expected to miss during any 30-day period due to his psychological symptoms. R. 313.  She listed the side effects of his medication as "none." R. 313.  The ALJ

7

assigned little weight to this opinion because it was "inconsistent with and not supported by other examinations by the claimant's treating sources." R. 22. The ALJ also noted that the opinion was "inconsistent with the ability to complete a Bachelor's Degree in college." R. 22.

Minton also underwent a consultative examination with June Nichols, Psy.D. on January 17, 2017. R. 297–300. After documenting his personal history, Dr. Nichols reported that Minton was "slightly disheveled" with good eye contact. R. 298. He was oriented to person, place, time, and situation, showed no limitations in speech, his stream of consciousness was clear, and his recent memory was grossly intact, while his immediate memory was fair. R. 298–99. Dr. Nichols described his mood as "dysthymic and congruent with thought processes" and his affect as depressed. R. 298. His general fund of knowledge was adequate, thinking abstract in nature, thought processes within normal limits, judgment and insight fair, and intelligence estimated in the average range. R. 299. His thought content was negative for auditory or visual hallucinations and there was no evidence of delusions. R. 299. Dr. Nichols stated that Minton did "experience ideas of reference" and cited statements such as his dislike of crowds. R. 299. Dr. Nichols also noted that Minton "confirmed obsessions and compulsions," had to follow a schedule without changes, and had to keep items in certain places. R. 299. He also confirmed panic attacks. R. 299.

As for his daily activities, Dr. Nichols noted that Minton lives with his parents, sleeps, watches television or plays video games during the day, and often does not have a desire to get up and goes back to bed during the day. R. 298 & 299.  He tends to the family's chickens and washes the dishes when his mother asks, but spends the majority of the day on the couch. R. 299.  He is not involved in any activities or organizations in the community, sometimes attends church and does not have any friends, but will occasionally talk with people online. R. 299.  He reported a good appetite and decreased energy, and he denied crying episodes or suicidal or homicidal ideations. R. 298.

Dr. Nichols' overall impression of Minton was obsessive compulsive disorder, panic disorder, moderate and recurrent major depressive disorder, and Autism Spectrum Disorder (Asperger's)." R. 299.  She opined that his "prognosis for significant improvement over the next 12 months is poor." R. 300.  Dr. Nichols further opined that "[h]is ability to respond appropriately to supervision, to coworkers and to work pressures in the work setting would be impaired with this combination of symptoms present." R. 300.  She stated that Minton "does have deficits, which would interfere with [his] ability to remember, understand and carry out work related instructions because of the OCD, panic attacks and his poor communication skills." R. 300.  She also stated that he can handle his own funds but cannot live independently. R. 300.

Dr. Nichols completed a mental health source statement form identical to the one completed by Dr. Rutherford. R. 329. Dr. Nichols did not date the statement, but there is a notation, presumably by Minton's mother, that she received the form from Dr. Nichols in October 2018. R. 329. There is no indication that Dr. Nichols examined Minton for a second time when she completed the form. Dr. Nichols circled "no" to every question except the first. R. 329. She stated that Minton would be off-task 90% of an 8-hour day and that he would be expected to miss 25 days during any 30-day period due to his psychological symptoms. R. 329. She did not list any side effects for Minton's medications. R. 329.

The ALJ assigned "little weight" to Dr. Nichols' opinions. R. 22. As to the November 17, 2017 report, the ALJ stated that "[t]he medical records indicate the claimant was alert and oriented to person[,] place[,] and time throughout his different mental examination." R. 22. As to the mental health source statement, the ALJ stated that this opinion was "inconsistent with and not supported by the other examinations by the claimant's treating sources." R. 22.

The ALJ issued his decision on January 31, 2019. R. 25. Under step one of the five-step evaluation process, the ALJ found that Minton has not been engaged in substantial gainful activity since October 31, 2016. R. 18. The ALJ concluded that Jones suffers from the severe impairments of Asperger's disorder, anxiety, obsessive compulsive disorder and mild recurrent major depression. R. 18–19. He also found

10

that Minton suffers from the non-severe physical impairment of gastroesophageal reflux disease ("GERD"). R. 18–19.  The ALJ noted that his medically determinable impairments significantly limit his ability to perform basic work activities. R. 18. But the ALJ concluded at step three of the analysis that none of Minton's impairments satisfied or medically equaled the severity of one of those listed in the applicable regulations. R. 19–20.

Before proceeding to the fourth step, the ALJ determined that Minton had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels with the following non-exertional limitations:

> He is able to remember, understand and apply simple and detailed instructions and concentrate and persist for two hour periods in an eight hour workday in order to complete simple routine work tasks with routine supervision; would be able to maintain superficial work relationship with co-workers and supervisors; however, would need to avoid work related contact with the general public; he would need to avoid close coordinated work with others, excessive workloads, quick decision-making, rapid changes and multiple demands.

R. 20.   At the fourth step, the ALJ determined that considering Minton's age, education, work experience, and RFC, he was capable of performing his past relevant work as a sorter. R. 23.   Based on this determination, the inquiry ended because a claimant who is capable of performing past work is not disabled. 20 C.F.R. §§ 416.920(a)(4)(v) & (g)(1).

The ALJ performed the step-five analysis, however, as an alternative finding. R 24.  He determined that considering Minton's age, education, work experience,

11

and RFC, there are jobs that he can perform that exist in significant numbers in the national economy. R. 24.   Therefore, the ALJ concluded that Minton was not disabled within the meaning of the Social Security Act from October 31, 2016 through the date of the decision. R. 25.  Based on these findings, the ALJ denied Minton's application. R. 25.

## IV.  DISCUSSION

Minton makes four arguments in favor of remand: (1) the ALJ failed to give proper weight to the opinions of the consultative psychologist, Dr. Nichols; (2) the ALJ failed to give proper weight to the opinions of the treating psychologist, Dr. Rutherford; (3) the ALJ's finding that he can perform his past relevant work is not supported by substantial evidence and not in accordance with proper legal standards; and (4) the ALJ's reliance on a vocational expert's testimony was in error because it was not based on a correct or full statement of Minton's limitations and impairments. Doc. 12 at 13–36.  The court addresses only the first two arguments because they warrant reversal and remand.

In assessing medical testimony, "the ALJ must state with some particularity the weight given to different medical opinions and the reasons therefor." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011).  Medical opinions are "statements from acceptable medical sources that reflect judgments about the nature and severity of [any] impairment(s), including . . . symptoms, diagnosis and

12

prognosis, what [a claimant] can still do despite impairment(s), and . . . physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(1) & 404.927(a).  In determining the weight given to a claimant's medical opinions, the ALJ may look at several factors: the examining and treatment relationship between the doctor and patient, the supportability of the doctor's opinion, the consistency of the doctor's opinion with the record as a whole, the doctor's specialty, and other relevant factors. 20 C.F.R. §§ 404.1527(c) & 416.927(c).

A doctor's opinion may be discounted based on the length and frequency of the treatment relationship and the nature and extent of the treatment relationship. 20 C.F.R. § 404.1527(c)(2).  A physician who saw the claimant on a single occasion is not considered a treating physician, and his opinion is not entitled to great weight. *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1160 (11th Cir. 2004).  The opinion of a treating physician who has seen the claimant on a number of occasions will be afforded more weight than a doctor who has seen the claimant only once. *Id*.  More weight will be afforded to a physician who has had long enough to form a longitudinal picture of the claimant's impairment, and the more knowledge a treating source has about the patient, the more weight will be given to that doctor's opinion. *Id*.

Here, Dr. Nichols was a consultative examiner, and although Minton contends that Dr. Rutherford is Minton's treating physician, at the time she completed the

13

mental health source statement she had seen him on only one occasion.  Therefore, their opinions are not entitled to any deference or special consideration. *See Crawford*, 363 F.3d at 1160; *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987). However, Minton argues that the ALJ failed to show good cause for the assignment of little weight to their opinions and failed to state with any clarity the reasons for discounting their opinions.  The court agrees.

As stated above, the ALJ's only preferred reason for assigning little weight to Dr. Rutherford's opinion was that the statement "is inconsistent with and not supported by the claimant's treating sources.  In addition, this is inconsistent with the ability to complete a Bachelor's Degree in college." R. 22.  As for Dr. Nichols, the ALJ assigned little weight to the November 2017 opinion because "the medical records indicate the claimant was alert and oriented to person[,] place[,] and time throughout his different medical examinations." R. 22.  The ALJ also assigned little weight to the October 2018 mental health source statement because it "is inconsistent with and not supported by the other examinations by the claimant's treating sources." R. 22.

On this record, the court cannot conclude that the ALJ fully developed his analysis and assignment of "little weight" with respect to either Dr. Rutherford or Dr. Nichols.  The stated reasons for discounting their opinions are conclusory and do not contain any substantive explanation of the ALJ's reasoning.  Such limited

14

discussion prevents the court from performing the required substantial evidence determination.  More specifically, the ALJ does not identify the treating sources which purportedly contradict Dr. Rutherford's and Dr. Nichols' opinions.  This is especially problematic given that there is no mention of any other treating sources in the ALJ's opinion.  Moreover, while Minton's receipt of a college degree is one factor to be considered, the record reflects that it did take him ten years to complete his coursework and that he was unable to finish his classes in person because of his impairments.  Although the ALJ recognized these facts in his description of Minton's testimony, there is no indication he considered them in evaluating Dr. Rutherford's opinion.  Additionally, the ALJ did explain how Minton's presentation as alert and oriented to time, person, and place during his mental evaluations leads to the conclusion that Dr. Nichols' substantive and thorough consultative opinion must be assigned little weight.

In sum, the court finds that substantial evidence does not support the decision of the ALJ regarding the opinions of Dr. Rutherford and Dr. Nichols.  On remand, the ALJ should clarify and explain his analysis of each of the doctor's opinions.  The court does not make any findings as to Minton's other arguments.

## V.  CONCLUSION

For the reasons set forth above, the court concludes that the ALJ's determination that Minton is not disabled is not supported by substantial evidence.

The decision of the Commissioner is due to be reversed and remanded for further proceedings, including for further examination, assessment, and evaluation the medical opinions. An appropriate order will be entered separately.

DONE and ORDERED on February 19, 2021.

_____

GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE

16